UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                 :

  YESH MUSIC, LLC and JOHN K.       :
  EMANUELE, individually and on behalf of  :
  all other similarly situated copyright holders,  :   **MEMORANDUM DECISION &**
                                  :   **ORDER**
                Plaintiffs,         :
                                    :   16 Civ. 1406 (BMC)
            - against -         :
                                    :
  AMAZON.COM, INC. and AMAZON        :
  DIGITAL SERVICES INC.,             :
                                    :
              Defendants.       :
--------------------------------------------------------- X

**COGAN,** District Judge.

       Plaintiffs are the owners of publishing rights associated with over one hundred copyright

registrations covering over two hundred musical recordings.  They bring claims against

defendants Amazon.com, Inc. and Amazon Digital Service, Inc. (together "Amazon" or

"defendant"), alleging that Amazon infringed their copyrights by distributing phonorecords of

plaintiffs' recordings on numerous online music service products without first securing

"compulsory licenses," as that term is defined under the Copyright Act.  Specifically, plaintiffs

allege that Amazon failed to timely serve on plaintiffs valid Notices of Intent to Obtain

Compulsory Licenses ("NOIs"), as the Copyright Act and applicable regulations require.

Alternatively, plaintiffs bring claims against Amazon for failure to pay royalties, alleging that

even if Amazon did secure compulsory licenses, it has underpaid royalty payments owed to

plaintiffs by manipulating its streaming reports and deleting streaming information.

       At the Initial Status Conference for this case in June 2016, Amazon represented to the

Court that it did not need discovery to prove that it is entitled to judgment as a matter of law on

certain of plaintiffs' claims.  It was thus permitted to move for partial summary judgment, prior

to the initiation of any discovery, on the limited issue of whether it had timely served valid NOIs

on plaintiffs.  After Amazon's motion for partial summary judgment was fully briefed,[1] plaintiffs

moved for leave to file a third amended complaint, alleging that they had recently discovered

new facts that affected both the issues raised in Amazon's motion and other claims in the

complaint.  I granted plaintiffs' motion to file a third amended complaint over Amazon's

objection, and permitted additional briefing from both sides addressed to the new allegations in

the third amended complaint.

For the reasons given below, Amazon's motion for summary judgment is granted in part

and denied in part.

## BACKGROUND

Plaintiff Yesh Music, LLC ("Yesh") is a music publishing company that owns the

copyrights to all songs created by the band The American Dollar.  Plaintiff John Emanuele and

non-party Richard Cupolo are the sole members of Yesh, as well as the sole composers of The

American Dollar's songs.  Plaintiff Emanuele is also the sole composer and owner of the

copyrights in songs that he has released under the collective name "Zero Bedroom Apartment."

Defendant Amazon operates Amazon Prime Music, in addition to other online music services,

which make songs available for streaming and downloading to certain subscribers.  Plaintiffs'

copyrighted songs are available on Amazon Prime Music, as well as other Amazon online music

services.

This case deals solely with plaintiffs' copyrights to the musical works embodied in the

---

[1] After Amazon filed its reply in further support of its motion for partial summary judgment, plaintiffs moved for leave to file a sur-reply, attaching the proposed sur-reply to their motion.  Amazon opposed.  Plaintiffs' motion for leave to file a sur-reply is granted and the Court will consider the sur-reply, as well as Amazon's memorandum in opposition to plaintiffs' motion, to the extent they add any additional relevant arguments.

The American Dollar and Zero Bedroom Apartment songs.  As composers, plaintiffs are entitled to two separate copyrights for each song – a copyright in the "musical work" and a copyright in the "sound recording."  See 17 U.S.C. § 102; Bridgeport Music, Inc. v. Still N The Water Publ'g, 327 F.3d 472, 475 n. 3 (6th Cir. 2003) ("Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights."); T.B. Harms Co. v. Jem Records, Inc., 655 F. Supp. 1575, 1576 n. 1 (D.N.J. 1987) ("When a copyrighted song is recorded on a phonorecord, there are two separate copyrights: one in the musical composition and the other in the sound recording."); see also 6 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 30.03 ("Copyright ownership of the physical embodiment of the performance of a musical composition . . . is distinct from the ownership of the copyright in the musical composition itself . . . . ").  A copyright in the musical work embodies the right to the musical composition, i.e., "the notes and lyrics of the song as they appear on sheet music." Recording Indus. Ass'n of Am., Inc. v. Librarian of Cong., 608 F.3d 861, 863 (D.D.C. 2010); see generally Nimmer on Copyright § 30.02.  A copyright in the sound recording, also called the "master recording," embodies the rights to a recording of a particular performance of the musical work by a specific artist.  Recording Indus. Ass'n of Am., Inc., 608 F.3d at 863.

Although a copyright consists of "a bundle of discrete exclusive rights," N.Y. Times Co. v. Tasini, 533 U.S. 483, 495-96 (2001); see also 17 U.S.C. § 106, this case only concerns plaintiffs' right to make and distribute phonorecords of their copyrighted musical works.  A phonorecord is simply a material object in which sounds are recorded or "fixed."  17 U.S.C. § 101.  For example, a CD is one type of phonorecord.  A license granted by the copyright owner to another party to copy and distribute phonorecords containing a particular musical work is called a "mechanical license."

In its memorandum in support of its motion for summary judgment, Amazon provides a helpful example that demonstrates how all of the concepts described above come together: To make and distribute a CD of Jimi Hendrix's recording of "All Along the Watchtower," a song written by Bob Dylan, "one would need a license to reproduce the sound recording from Jimi Hendrix's record label, . . . and a mechanical license from Bob Dylan's music-publishing company."

Here, plaintiffs allege that Amazon has infringed their copyrights by failing to secure a compulsory mechanical license prior to producing and distributing their musical works on Amazon Prime Music. Amazon needs a mechanical license to offer plaintiffs' songs on Amazon Prime Music because that service provides a feature where a user can download a song for offline playback, which creates a fixed copy, considered to be a phonorecord, of the song on the user's device. See United States v. Am. Soc. of Composers, Authors, and Publishers, 485 F. Supp. 2d 438, 444 (S.D.N.Y. 2007) ("[T]he downloading of a music file is . . . characterized as a method of reproducing that file.") (emphasis omitted); Maverick Recording Co. v. Goldshteyn, No. CV-05-4523, 2006 WL 2166870, at *3 (E.D.N.Y. July 31, 2006) (same); see also A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights.").

A compulsory license under § 115 of the Copyright Act allows an individual to make and distribute phonorecords of a copyrighted musical work, without reaching any kind of agreement with the copyright owner, on terms and rates set by the Copyright Act and applicable regulations. See generally 17 U.S.C. § 115; 37 C.F.R. § 385.1. Once a copyright owner distributes the musical work "to the public," the compulsory license provision of § 115 is triggered, and anyone may obtain a compulsory license in the musical work by serving an NOI on the copyright owner

within the applicable time frame and following other specific requirements set out in the copyright regulations.  <u>See</u> 17 U.S.C. § 115(a), (b).

There are twelve Amazon NOIs that are the subject of this motion, ten of which relate to plaintiff Yesh's copyrights to The American Dollar's songs, and two of which relate to plaintiff Emanuele's copyrights to Zero Bedroom Apartment's songs.  Asserting a multitude of violations and defects, plaintiffs claim that all twelve of Amazon's NOIs are invalid, and thus deprive Amazon of compulsory licenses to plaintiffs' copyrights.

Plaintiffs' allegations can be boiled down to three main arguments.  First, the NOIs are invalid because they were either never served, untimely served, or improperly served.  Second, even if the Court finds that Amazon timely and validly served all twelve NOIs, certain NOIs are still invalid because they fail to comply with technical requirements regarding the content of an NOI.  This alleged non-compliance consists of (1) the NOIs' failure to identify Amazon Prime Music as a service upon which plaintiffs' musical works would be made available; (2) the lack of some NOIs to include the required signature and designated date of distribution; and (3) other NOIs' incorrect inclusion of the parenthetical "(Alt Mix)" in the title of the songs, when the "alt mix" versions of the songs were never released to the public.  Finally, plaintiffs contend that Amazon was required to, but did not, serve separate NOIs for the "ambient" versions (as explained below) of plaintiffs' songs.[2]

Amazon denies that the alleged defects exist or that they render the NOIs invalid, and has moved for summary judgment for a determination that it has served valid NOIs, and therefore has compulsory licenses to make and distribute phonorecords of plaintiffs' musical works.  With one exception, plaintiffs' arguments are without merit, and Amazon's motion for partial

---

[2] Plaintiffs also claim that Amazon never served NOIs for additional songs that are not listed on the 12 NOIs.  This allegation does not affect the limited issue on this summary judgment motion, which is whether the 12 NOIs were timely and validly served and properly apply to the songs listed.

summary judgment is therefore denied in part and granted in part.[3]

## DISCUSSION

"[S]ummary judgment may be granted only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135 (2d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). Upon consideration of a motion for summary judgment, the court must construe the facts in the light most favorable to the nonmoving party and resolve all factual ambiguities in that party's favor. Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006). In ruling on a motion for summary judgment, a district court "may rely on any material that would be admissible at a trial." Lyons v. Lancer Ins. Co., 681 F.3d 50, 57 (2d Cir. 2012) (internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits or other documentation, "the non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial . . . ." Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp., 635 F.3d 48, 52 (2d Cir. 2011) (internal quotation marks omitted)). A dispute is not "genuine" if no reasonable factfinder "could return a verdict for the nonmoving party." Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). This means that the nonmoving party must present more than a "scintilla of evidence," Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (internal quotation marks omitted), and cannot rely on conclusory statements or "mere assertions that

---

[3] Although plaintiffs argue that the Court should reject the numerous affidavits Amazon has submitted, plaintiff have neither requested discovery under Federal Rule of Civil Procedure 56(d), nor described what discovery they might require, nor identified any circumstances that would call Amazon's affidavits into question.

affidavits supporting the motion are not credible." <u>Gottlieb v. Cty. of Orange</u>, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

**I. <u>Valid and Timely Service of the NOIs</u>**

    **A. Actual Service**

As mentioned above, there are ten NOIs that relate to plaintiff Yesh's copyrights in The American Dollar's songs. Even though they attached all ten NOIs to the third amended complaint, plaintiffs claim that Amazon never served eight of them. The only support plaintiffs identify for this claim is a conclusory allegation that Yesh "has no record of ever receiving [these] NOI[s]."

Relying upon the mailbox rule and its presumption of receipt, Amazon maintains that it served six paper NOIs on plaintiff Yesh via First Class Mail. To support this claim, Amazon has submitted the affidavit of William B. Colitre, Vice President and General Counsel of Music Reports, Inc., which is Amazon's agent responsible for generating and mailing NOIs on its behalf. In his affidavit, Colitre avers that Music Reports has an established procedure to create and mail NOIs, which it uses and follows in the ordinary course of its business, and he explains the numerous steps involved in that process. Colitre also avers that this procedure was used to send the six paper NOIs that Yesh claims it had never received, and that the six paper NOIs were sent to Yesh at the address listed on its signed W-9 form, which Yesh provided to Music Reports by email.[4] Plaintiffs fail to address the Colitre affidavit or propound any argument in support of their claim that Yesh never received the six paper NOIs.

Under the mailbox rule, where, as here, there is proof of an office procedure that is followed in the regular course of business, and these procedures establish that the required letters or notices have been properly addressed and mailed, a rebuttable presumption arises that the

---

[4] The email and W-9 form are attached to the Colitre affidavit.

letter or notice was actually received by the person to whom it was addressed. Leon v. Murphy, 988 F.2d 303, 309 (2d Cir. 1993) (quoting Meckel v. Cont'l Res. Co., 758 F.2d 811, 817 (2d Cir. 1985)); accord Ma v. Merrill Lynch, Pierce, Fenner & Smith, 597 F.3d 84, 92 (2d Cir. 2010); Akey v. Clinton Cty., N.Y., 375 F.3d 231, 235 (2d Cir. 2004). As I have previously explained, "[t]he mere denial of receipt does not rebut that presumption. There must be – in addition to denial of receipt – some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable." Zirogiannis v. Nat'l Recovery Agency, Inc., No. 14-3954, 2015 WL 8665448, at *6 (E.D.N.Y. Dec. 11, 2015) (quoting Leon, 988 F.2d at 309). Further, under New York law, "personal knowledge of mailing procedures is required only to establish regular office procedure, not the particular mailing." Id.

The Colitre affidavit is more than sufficient to create the presumption that Yesh received the six paper NOIs. It establishes that the NOIs were created and mailed in the usual course of Music Report's business, according to established procedure, and were addressed to Yesh at the address it directly provided. Yesh's conclusory allegations that it never received the NOIs do not rebut this presumption, nor create any factual dispute. Amazon has therefore sufficiently established that Yesh received the six paper NOIs.

## B. Valid Method of Service

Second, as to the remaining four Yesh NOIs, plaintiffs claim that three were invalidly served. Amazon, again relying on the Colitre affidavit, maintains that it electronically served all three NOIs, which are dated between January 2015 and November 2015, by uploading them to Yesh's web account on Music Reports' web portal. Amazon claims that this was proper because on February 12, 2014, Yesh consented to electronic service in this fashion.

8

Plaintiffs admit that Yesh consented to electronic service of NOIs in February 2014, but claim that Yesh revoked such consent on August 2014, making the electronic service of the three NOIs in 2015 invalid. To support this claim, plaintiffs submit an August 21, 2014 email that Richard Cupolo sent on behalf of Yesh to Music Reports, which is attached to Cupolo's affidavit. The August 21, 2014 email contains the subject "No More NOI's [sic]" and states: "[T]his is Richard Cupolo from Yesh Music LLC, representing the works of the musical group The American Dollar. We wish for Music Reports, Inc. and any of its affiliated companies to cease the issue [sic] of any and all future compulsory mechanical licensing NOI's [sic] on our behalf effectively immediately."

Besides being legally ineffective, this email, by its terms, in no way operates as a revocation of consent to electronic service. It is an attempt by Yesh to revoke consent to service of all NOIs in any manner. But as Music Reports informed Yesh in an email in response, that was not an option. Section 115 of the Copyright Act provides that a party has a right to obtain a compulsory license to a musical work, whether the copyright holder wishes to license the work or not. Yesh did not have the option of refusing service of Amazon's NOIs, and because its consent to electronic service was never revoked, the electronic service of the NOIs in 2015 was valid.[5] Amazon has therefore sufficiently established that all ten Yesh NOIs were validly served, even though Yesh disputes service only as to eight.

### C. Timely Service

Third, plaintiffs claim that even if the Court finds that Music Reports properly served the Yesh NOIs, service of all twelve NOIs (ten related to Yesh, two related to Emanuele) was

---

[5] Plaintiffs also contend that the August 21, 2014 email operated as a revocation of consent for Music Reports to receive NOIs on Yesh's behalf. But Music Reports was not acting on Yesh's behalf – Music Reports was Amazon's agent, serving NOIs on Yesh on Amazon's behalf.

untimely because Amazon had been distributing phonorecords of plaintiffs' musical works for years prior to service.

To obtain a compulsory license to a musical work, a person must serve an NOI on the copyright owner "before or within thirty days after making, and before distributing any phonorecords of the work . . . . " 17 U.S.C. § 115(b)(1). "That time-limit is strictly enforced: 'Failure to serve or file the notice required by [§ 115(b)(1)] forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement.'" 24/7 Records, Inc. v. Sony Music Entm't, Inc., 429 F.3d 39, 42-43 (2d Cir. 2005) (quoting 17 U.S.C. § 115(b)(2)). According to plaintiffs, because Amazon distributed phonorecords of plaintiffs' musical works prior to serving the NOIs, the NOIs are invalid and Amazon is liable for copyright infringement.

In support of their claim that Amazon distributed phonorecords prior to service of the NOIs, plaintiffs have submitted, attached to affidavits by Cupolo and Emanuele, numerous "stream" or "royalty" reports from TuneCore – the company that plaintiffs engaged to distribute their songs to online music services on their behalf.[6] The TuneCore reports are monthly reports,

---

[6] In the initial round of briefing, the Emanuele and Cupolo affidavits attached streaming reports purportedly from Music Reports. In its reply, Amazon pointed out that the reports plaintiffs submitted were not from Music Reports, but were actually from TuneCore. The difference is significant because TuneCore reports all streams of plaintiffs' music, including streams pursuant to a voluntary license, whereas Music Reports only reports streams pursuant to a compulsory license.

To support its contention that the reports that plaintiffs submitted are not from Music Reports, Amazon relied on the Colitre affidavit, in which he averred that none of plaintiffs' reports "show[] any indicia of having come from any interface offered by Music Reports." It also submitted the affidavit of Andrew Migdail, Director of Operations at TuneCore, in which Migdail averred that plaintiff Emanuele has two accounts with TuneCore, and that the streaming reports submitted by plaintiff "reflect a form in which data could be accessed via the TuneCore artist interface, and use column headings consistent with column headings used on the TuneCore artist interface."

Plaintiffs failed to directly respond to this point. However, plaintiffs submitted reports in the supplemental round of briefing that look substantially similar to those submitted in the initial round of briefing, this time admitting that the reports came from TuneCore. In the supplemental round of briefing, plaintiffs also claim that the TuneCore reports show the accurate number of streams of plaintiffs' songs, and that the reports from Music Reports are inaccurate because it has been deleting streams of plaintiffs' songs.

running from July 2012 to December 2014. These reports indicate the number of times that Amazon "streamed" plaintiffs' songs in each month. Plaintiffs claim that these reports, which are dated prior to service of the NOIs, demonstrate that Amazon distributed phonorecords of their musical works prior to serving NOIs.

Amazon does not contest that the TuneCore reports demonstrate that Amazon streamed plaintiffs' songs prior to serving the NOIs. However, it argues that these streams do not render service of the NOIs untimely because all of the streams identified were either made in connection with a particular Amazon music service that does not require a compulsory license, or were streamed pursuant to a consensual license between Amazon and plaintiffs. To consider this argument, we must understand the various, very different music streaming services that Amazon provides.

Amazon submits the declaration of Daniel Climan, a Principal Specialist for Digital Music at Amazon, in which Climan describes Amazon's four online music services as follows:

(1) Amazon MP3 Store (also known as Amazon Music Store) is an online store from which users can purchase – and thereafter, download and stream – music. Music is purchased for a one-time fee per track or per album.

(2) Amazon has offered, under various names at various times, a storage area (the "non-premium music locker") to which users can upload music files, which Amazon stores on their behalf and which the particular user who uploaded a particular copy of a music file can later download or stream that file [as opposed to a different copy of that file] from the user's personal "locker."

(3) Amazon Cloud Player Premium is a service by which certain users can "scan

To make matters even more confusing, in Cupolo's affidavit in opposition to defendants' application for attorneys' fees, Cupolo first states that the reports attached as Exhibit C are correct copies of "music reports monthly report[s]," and then, in complete contradiction to that statement, avers that the reports attached as Exhibit C are "TuneCore yearly spreadsheet[s] of streams." At other times, the Cupolo and Emanuele Declarations simply state that the attachments are "streaming reports," without identifying from where the reports originate.

I cannot tell if plaintiffs really do not know where these reports come from, or if they are deliberately attempting to deceive me. In any event, Amazon's clear explanation of the provenance of the various reports cannot be challenged by the contradictory and vacillating positions that plaintiffs have taken. The Court will thus construe the reports from the original round of briefing, and the following reports that are similar, as TuneCore reports.

and match" music files on their computers, adding them to the user's music "locker," and "upgrade" music files they previously uploaded.

(4) Amazon Prime Music is a service by which certain users can play music of their choice from the Prime Music catalog, whether or not they possess a copy of that music.

Amazon argues that of these four services, only two require a compulsory license – Amazon Cloud Player Premium and Amazon Prime Music. The Amazon MP3 Store service operates under a voluntary license between Amazon and plaintiffs, and thus Amazon does not need a compulsory license. The non-premium music locker is a service that only allows users to store and access their own music, and thus, because there is no distribution "to the public," as Amazon defines that term, Amazon also does not need a compulsory license for this service.

Amazon also relies on the Climan affidavit to prove that all of the streams identified in the TuneCore reports were connected with services that do not require compulsory licenses – the Amazon MP3 Store and the non-premium music locker. Climan avers that he has determined that none of the streams identified on the TuneCore reports came from Amazon Prime Music or the Amazon Cloud Player Premium. Before making this determination, Climan did the following: (1) he reviewed the TuneCore streaming reports submitted by plaintiffs; (2) he reviewed Amazon's records relating to the songs and time periods identified in the TuneCore reports to determine the number of "plays" and "downloads" Amazon reported to TuneCore; and (3) he reviewed Amazon's records relating to Amazon Prime Music and Amazon Cloud Player Premium to determine if there were any "plays" or "downloads" of the particular songs during the particular time periods identified in the TuneCore reports.

Based on the above records, Climan was able to determine that: (1) for each song in each time period there were no plays or downloads of the songs via the Amazon Prime

Music or Amazon Cloud Player Premium service; and (2) the number of "plays" plus the number of "downloads" Amazon reported for each song in each time period equals the number of streams identified in the TuneCore reports. Amazon argues that the Climan affidavit sufficiently establishes that all streams came from the Amazon MP3 Store and non-premium music locker, and therefore all NOIs were timely served.

Yesh opposes Amazon's contentions on both factual and legal bases, arguing that it is "impossible" that the streams identified on the TuneCore reports all relate to the Amazon MP3 Store and non-premium music locker, and, even if they do, the NOIs are still invalid because those services also require a compulsory license. I will address the latter argument first because, if plaintiffs are correct, and all Amazon music services require compulsory licenses, then it is irrelevant to which service the TuneCore streams relate.

### 1. Amazon MP3 Store

Amazon argues that it does not need a mechanical license for the Amazon MP3 Store because plaintiffs, through TuneCore, granted Amazon a voluntary mechanical license for this use. Plaintiffs entered into two agreements with TuneCore, one with respect to songs by The American Dollar in April 2007, and one with respect to songs by Zero Bedroom Apartment in January 2011, to have TuneCore distribute their songs to online music services on their behalf. The Terms and Conditions of plaintiffs' agreements with TuneCore specify that plaintiffs grant TuneCore the right to "sell, copy, distribute, and otherwise exploit [plaintiffs'] 'Recordings,' [as defined elsewhere in the Terms and Conditions] by all digital means and media . . . through the any [sic] and all digital Internal consumer stores (e.g., 'iTunes' and 'Rhapsody') now in operation or hereafter available." Based on this grant of authority, TuneCore entered into an

agreement with Amazon providing Amazon with the right to offer plaintiffs' songs on its

Amazon MP3 Store.

Plaintiffs do not contest that they entered into agreements with TuneCore on those Terms

and Conditions, nor that Amazon entered into an agreement with TuneCore. However, they

argue that their agreements with TuneCore only grant TuneCore the authority to license the

copyrights to their sound recordings, not the copyrights to their musical works. Thus, according

to plaintiffs, in addition to buying their songs from TuneCore, Amazon needed to obtain a

compulsory mechanical license to the musical works to sell their songs on the Amazon MP3

Store.

In support of this theory, plaintiffs point to TuneCore's Terms and Conditions, which

state that plaintiffs are only granting TuneCore the rights to their "Recordings" and explicitly

define "Recordings" as "the sound recordings," with no mention of musical works. If these were

the only terms in the TuneCore agreement, I would agree with plaintiffs. However, the section

of the Terms and Conditions entitled, "THIRD PARTY OBLIGATIONS," defeats plaintiffs'

argument. That section provides:

> You [plaintiffs] shall be solely responsible for securing and paying for digital
> phonorecord delivery (DPD), mechanical and any other licenses required from
> musical composition copyright owners (or their agents) in connection with
> [TuneCore's] exploitation of rights hereunder, royalties due to artists, producers
> and other persons who performed in the making of the Recordings and all
> payments that may be required under collective bargaining agreements.

Even though the definition of "Recording" is silent as to the rights to plaintiffs' musical works,

these terms clearly inform plaintiffs that by entering into this agreement, they agree that any

online music providers who purchase their songs from TuneCore do not need to secure a

mechanical license, and that they will not be paid additional royalties for the copyrights in their

musical works.

Plaintiffs ask me to ignore the actual language of the terms, and find that Amazon, and not plaintiffs, was required to secure a mechanical license because the section heading "THIRD PARTY OBLIGATIONS" must be read as imposing obligations on third parties, not the parties to the contract. This argument is frivolous. The terms clearly elucidate that the title "THIRD PARTY OBLIGATIONS" refers to the obligations plaintiffs owe to third parties under the agreement, not obligations third parties owe to plaintiffs.

To make it even clearer to plaintiffs that neither TuneCore nor the online music providers are required to secure mechanical licenses prior to using plaintiffs' songs, the next section of the Terms and Conditions, entitled, "WARRANTIES; REPRESENTATIONS; INDEMNITIES," states:

> You [plaintiffs] warrant and represent that you have the right and authority to enter into this agreement and to grant to [TuneCore] all rights specified; all of the Recordings . . . are owned or controlled by you and shall not infringe on the copyrights or other rights of any person or entity; and that [TuneCore] shall have the right to exploit same in all manner hereunder free from adverse claim and without any obligation to make any payment of any nature to any person or entity, other than the royalties due to you described in paragraph 3 above.

The application of these terms is more easily understood in a situation where the artist submitting a song to TuneCore owns the copyright to the sound recording, but does not own the copyright to the underlying musical work embodied in the song. In that situation, the artist would be required to secure a mechanical license from the copyright owner of the musical work prior to submitting his song to TuneCore. The artist would then be responsible for paying any royalties to the copyright owner of the musical work out of the payments he receives from TuneCore.

Here, however, plaintiffs did not need to do anything to comply with the Terms and Conditions because, unlike the artist in the hypothetical, they own the copyrights to both the sound recordings and musical works. Thus, by agreeing to these terms and ensuring that no

copyrights would be infringed when TuneCore sold the songs, plaintiffs implicitly granted TuneCore, and in turn, Amazon, a voluntary license to both its sound recordings and musical works.

Plaintiffs next argue that the Court should ignore the language of the Terms and Conditions, and instead rely on statements a TuneCore representative made in email communications with Cupolo and Emanuele in 2014. In a confusing chain of emails, in which it is clear that the TuneCore representative did not understand Cupolo's question of whether TuneCore "issue[s] any songwriter mechanical licenses on [The American Dollar's behalf]," a TuneCore representative stated the following: "we [TuneCore] have not and will not issue any mechanical license on your behalf because your [sic] are not signed up for our publishing administration service. And, once again, you are not subject to the terms and conditions of our publishing administration service . . . . "

Because the Terms and Conditions unambiguously require plaintiffs to secure mechanical licenses so that Amazon, or any other online music provider, can exploit plaintiffs' songs, this email is inadmissible under the parol evidence rule. Plaintiffs cannot use extrinsic evidence, such as the email chain between them and a representative of TuneCore, to support their interpretation of TuneCore's Terms and Conditions. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) (noting that courts should not look to extrinsic evidence when interpreting an unambiguous contract); Int'l Klafter Co., Inc. v. Cont'l Cas. Co., Inc., 869 F.2d 96, 100 (2d Cir. 1989) ("It is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible.").

Additionally, even if I considered the email chain, it would be worth very little. As

mentioned above, it is clear that TuneCore's representative did not understand plaintiffs' questions – maybe because the very Terms and Conditions of the agreement make it clear that an online music provider does not need to obtain a mechanical license. Further, the TuneCore representative qualified her statement that TuneCore does not issue mechanical licenses on plaintiffs' behalf by reminding plaintiffs that they are "not subject to the terms and conditions of [TuneCore's] publishing administration service." The representative did not comment on the "distribution services" Terms and Conditions, to which plaintiffs agreed, and which state that it is plaintiffs, not Amazon, or any other entity in its position, that must secure a mechanical license.[7]

Therefore, according to the TuneCore agreement, any streams of plaintiffs' songs on the Amazon MP3 Store were subject to a voluntary license, and thus do not render Amazon's service of NOIs untimely.

### 2. Non-Premium Music Locker

Amazon also contends that the non-premium music locker service does not require Amazon to secure a compulsory license. As described above, the non-premium music locker is a service that allows users to upload and store their own music files in a personal cloud storage space, and thereafter to stream or download the very same files that they themselves uploaded. Amazon contends that such a service does not involve a distribution "to the public," and thus a license, either compulsory or consensual, is not required. See 17 U.S.C. § 106 (3) ("[T]he owner of a copyright . . . has the exclusive right[] to . . . distribute copies or phonorecords of the copyrighted work to the <u>public</u> . . . .") (emphasis added).

Plaintiffs argue that starting on January 1, 2014, Amazon was required to have a

---

[7] Plaintiffs even appear to concede that Amazon had a license to offer plaintiffs' songs on the Amazon MP3 Store, stating in their supplemental memorandum in opposition that, "[a]t all times . . . every Amazon product, with the exception of the Amazon Online store, fell under Section 115."

compulsory license to operate the non-premium music locker service because on that date, the copyright regulations were amended to include compulsory license rates for "[p]aid locker service[s]," and "[p]urchased content locker service[s]." See 17 C.F.R. § 385.23(a)(4), (5). Plaintiffs are essentially arguing that Amazon's non-premium locker service did not constitute infringing conduct prior to January 1, 2014, but after that it did.

Although regulations can proscribe conduct that was previously acceptable, that is not what the amendments to § 385.23 did. Indeed, § 385.10 explicitly states that the regulations in this subpart are intended "only to set rates and terms" for where a compulsory license has been obtained, and they do not "express or imply any conclusion as to the circumstances in which any of the exclusive rights of a copyright owner are implicated or a license, including a compulsory license pursuant to 17 U.S.C. 115, must be obtained." 37 C.F.R. § 385.10.

Therefore, even though Amazon's own description of the non-premium locker service seems to indicate that it falls within the definition of "locker service"[8] in § 385.21 – a point on which neither party has presented arguments – that does not resolve the question of whether Amazon was required to obtain a compulsory license. Although a locker service where users do not access the exact music file that they uploaded, but a different version of the file that the service provides to them, has been held to constitute copyright infringement, see UMG Recordings, Inc. v. MP3.Com, Inc., 92 F. Supp. 2d 349 (S.D.N.Y. 2000), I have not found, nor have the parties identified, a case discussing whether a locker service where the user uploads material and then streams and downloads that exact copy of the material, constitutes a

---

[8] Section § 385.21 defines "locker service" as a:

> service providing access to sound recordings of musical works in the form of interactive streams, permanent digital downloads, restricted downloads, or ringtones, where the service has reasonably determined that phonorecords of the applicable sound recordings have been purchased by the end user or are otherwise in the possession of the end user prior to the end user's first request to access such sound recordings by means of the service.

distribution of phonorecords to the public.

However, in light of the Supreme Court's decision in <u>American Broadcasting Companies,</u> <u>Inc. v. Aereo, Inc.</u>, 134 S. Ct. 2498 (2014), it is clear that, regardless of whether the non-premium locker service constitutes a "distribution" of phonorecords under the Copyright Act, which it is not clear that it does, Amazon's non-premium locker service certainly does not involve a distribution to the "public." In <u>Aereo</u>, the Supreme Court held that the defendant, which streamed the plaintiffs' copyrighted television programs over the internet to subscribers of the defendant's service, violated the Copyright Act because such streaming constituted a performance of plaintiffs' works to the "public." <u>Id.</u> at 2507-09. The subscribers were considered members of the "public" because they "consist[ed] of a large group of people outside of a family and friends." <u>Id.</u> at 2510. The Court noted, however, that the subscribers would not have been considered the "public" if they had received the performances "in their capacities as owners or possessors of the underlying works," because a person's "relationship to the underlying work" determines whether that person is a member of the "public." <u>Id.</u>

Applying that reasoning here, when users downloaded and streamed plaintiffs' songs from their personal locker, that distribution was not one to the "public" because the users, who had uploaded plaintiffs' songs that they already possessed, received the songs in their capacities as owners. Thus, because plaintiffs' songs were not distributed to the public, Amazon did not need to secure a compulsory license for the non-premium music locker service.

Plaintiffs concede by their silence that the non-premium music locker users were not members of the "public." They do, however, contest that the non-premium music locker users downloaded and streamed the exact copies of the songs that they uploaded to their personal locker. Plaintiffs claim that the non-premium music locker uses the "scan and match"

technology that the Amazon Cloud Player Premium service uses, which Amazon admits requires a compulsory license.[9] Plaintiffs even go so far as to claim that the non-premium locker service does not exist, and that the only locker service Amazon operates is the Amazon Cloud Player Premium. Plaintiffs, however, cannot identify any support for this allegation beyond their own conclusory statements, which the Court need not accept on summary judgment. See Goenaga v. March of Dimes Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (A motion for summary judgment "will not be defeated merely on the basis of conjecture or surmise.") (internal quotation marks omitted). Plaintiffs have thus failed to raise a genuine dispute as to whether Amazon needs a compulsory license to operate the non-premium music locker service.

### 3. Origin of the Streams Identified on the TuneCore Reports

Having found that the Amazon MP3 Store and non-premium music locker do not require Amazon to secure a compulsory license, the issue boils down to whether all of the streams on the TuneCore reports represent use on those services, or whether any streams originated from the Amazon Cloud Player Premium or Amazon Prime Music.

As explained above, Amazon maintains that all streams came from the Amazon MP3 Store and the non-premium music locker, relying on Climan's affirmation that, after reviewing the TuneCore reports and comparing them to Amazon's records, "there were no Amazon Cloud Player Premium or Amazon Prime Music plays or downloads for any of the songs identified" in the TuneCore reports. Additionally, Amazon claims that these results are consistent with the design and configuration of Amazon's systems, which, as Climan avers, "prevent the use of any

---

[9] Plaintiffs claim that a July 2012 Amazon press release regarding updates to the Amazon Cloud Player Premium technology demonstrates that all of Amazon's storage services use "scan and match" technology. That is far from the case. The press release does not discuss the non-premium music locker, nor does it indicate that all storage services will use the scan and match technology that is used for the Amazon Cloud Player Premium. Indeed, the press release's statement that, "[s]tarting today, Cloud Drive will be used for file storage and Cloud Player will be used for music storage and playback," indicates that there are other Amazon services that do not use the same technology as the Amazon Cloud Player Premium.

Amazon Cloud Player Premium or Amazon Prime Music features with respect to tracks [that have not] been identified to the system as tracks for which an NOI [has been] sent . . . . "

Plaintiffs do nothing to refute the Climan affidavit except assert additional conclusory allegations. For example, plaintiffs argue that the streams identified on the TuneCore reports cannot represent streams via the Amazon MP3 Store. But the only support that they identify for this allegation is Cupolo's affidavit in which he avers that, "MP3 sales are paid and reported separately by TuneCore" and "[i]t is impossible to believe defendants really believed the TuneCore data relates in any way, no less consists solely of MP3 sales or 'personal lockers.' All streams are attributable to defendants' free or paid locker space (which I have been informed are both covered under Section 115)." What Cupolo considers possible or impossible to believe is immaterial in light of the evidence that Amazon has submitted. Unsubstantiated conclusions and hearsay legal opinions are insufficient to defeat summary judgment. See Reece v. N.Y.S. Dep't of Taxation and Fin., 104 F.3d 354 (2d Cir. 1996); see also Fed. R. Civ. P. 56(c)(4) (Where a party relies on affidavits to establish facts, the statements "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.").

Plaintiffs also argue that the streams cannot possibly relate to Amazon MP3 sales because plaintiffs are paid $.63-$.70 for a MP3 sale of an individual song, and the TuneCore reports indicate that plaintiffs were paid at an average rate of $.00001 per stream. This argument relates to damages – it does not demonstrate that the users accessed the streams via the Amazon Cloud Player Premium or Amazon Prime Music services.

Finally, plaintiffs claim that the Climan affidavit is false because he represents that there were substantially more "sales" of certain of plaintiffs' songs than there actually were. This is

based on an erroneous reading of the Climan affidavit.  Climan does not make any representations about the number of sales of plaintiffs' songs; rather he identifies the number of "downloads."  Based on the structure of the Amazon MP3 Store service, a person who purchases a song can download it more than once, and so the number of downloads in Climan's chart do not equate to the number of sales.

There is no genuine dispute.  Amazon has shown that it did not impermissibly distribute phonorecords of plaintiffs' musical works prior to the service of the NOIs.  The NOIs were therefore timely served and conferred on Amazon valid compulsory licenses to plaintiffs' musical works.

## II.  <u>Technical Violations of the NOI Requirements</u>

Plaintiffs' second claim is that the NOIs are invalid because they suffer from one or more incurable technical violations.  Plaintiffs first argue that the NOIs cannot cover Amazon's use of plaintiffs' musical works on its Amazon Prime Music, which is a "bundled subscription service," because the NOIs do not specifically identify that phonorecords of plaintiffs' songs will be distributed on that type of service.  This argument is meritless.

The copyright regulations require that each NOI identify "[t]he types of all phonorecords already made (if any) and expected to be made under the compulsory license (for example: single disk, long-playing disk, cassette, cartridge, reel-to-reel, a digital phonorecord delivery, or a combination of them)."  37 C.F.R. § 201.18(d)(v)(D).  Nothing in the regulations requires that the entity seeking to obtain a compulsory license specifically identify the name or type of music service on which it will be distributing the phonorecords.  Moreover, even if the regulations did contain such a requirement, Amazon's NOIs would be sufficient.

Each of the twelve Amazon NOIs contained the following statement: "Phonorecord configuration(s): Digital Phonorecord Deliveries, as set forth in 17 U.S.C. § 115 including, but

not limited to, interactive streams and permanent digital downloads associated with a paid locker service and/or a purchased content locker service." This statement notified plaintiffs of the type of phonorecords Amazon expected to make – "digital phonorecord deliveries" – and, although not required by the regulations, included examples of the types of online services on which the phonorecords would be provided – "interactive streams and permanent digital downloads associated with a paid locker service and/or purchased content locker service." However, this statement does not limit Amazon to only "paid locker service[s]" or "purchased content locker service[s]." The inclusion of the phrase, "including, but not limited to," signals to plaintiffs that the distribution of phonorecords will not be limited to locker services, or even to services of the same general kind. See In re Matter of: Sterling United, Inc., No. 15-4131, 2016 WL 7436608, at *2 (2d Cir. Dec. 22, 2016) (summary order) ("The term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.") (quoting Federal Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 100 (1941)); see also Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc., 63 F.3d 262, 280 (3d Cir. 1995) ("By using the phrase 'including, but not limited to,' the parties unambiguously stated that the list was not exhaustive.").

Moreover, plaintiffs admit that the Amazon Prime Music service was created after the NOIs were sent; indeed, their very contention is that Amazon is required to send a separate NOI each time it develops a new service for which it wants to use a compulsory license that it already holds. This contention runs contrary to the principles underlying the NOI requirements. Section 201.18(d)(3) provides that where the regulations require that the entity seeking to obtain the compulsory license include information "if known" or as "expected," such "information shall be given in good faith and on the basis of the best knowledge, information, and belief of the person

signing the [NOI]." 37 C.F.R. § 201.18(d)(3). Here, the regulations required Amazon to identify

the types of phonorecord configurations "expected to be made," and that is exactly what it did.

Plaintiffs have made no allegations that Amazon knew about Amazon Prime Music at the time it

sent the NOIs, or that it concealed its expectations in bad faith. Thus, the NOIs cover not only

locker services, but also "bundled subscription services," like Amazon Prime Music.

 Plaintiffs' next claim is that six of the twelve NOIs are invalid because they bear no

signature. The copyright regulations require that the NOI be "signed by the person or entity

intending to obtain the compulsory license or by a duly authorized agent of such person or

entity." 37 C.F.R. § 201.18(e). However, if the NOI is sent electronically, the regulations

provide for an alternative to the signature requirement: The entity seeking to obtain the

compulsory license and the copyright owner are permitted to "establish a procedure to verify that

the [NOI] is being submitted upon the authority" of that entity. 37 C.F.R. § 201.18(e)(4).

 Two of the six NOIs that plaintiffs identify as lacking a proper signature were sent by

mail. Amazon has provided these two NOIs as attachments to the Colitre affidavit, and each

clearly bears the signature of William Colitre on the first page. Plaintiffs fail to address this

plain fact, and thus have not raised a genuine dispute as to whether the two paper NOIs were

signed.

 The remaining four NOIs that plaintiffs identify as lacking a signature were sent

electronically. As described previously, electronic service of the NOIs entailed Music Reports,

Amazon's agent for the creation and service of NOIs, uploading the NOIs to plaintiffs' web

account on Music Reports' web portal, where plaintiffs were able to access and view them.

Amazon argues that this method of service, to which plaintiffs agreed, is a sufficient alternative

to the signature requirement. Because they could only access the NOIs by logging into their

personal accounts on the official Music Reports website, plaintiffs were able to verify that the particular NOIs were authentic and authorized by Amazon.

I agree with Amazon. This method of electronic service ensured that plaintiffs were able to determine whether the NOIs were authentic and authorized, and it thus satisfies the alternative option to the signature requirement provided in 37 C.F.R. § 201.18(e)(4). Further, plaintiffs have not made any allegations that Amazon did not authorize the NOIs or even that plaintiffs had doubted that they had. Thus, to the extent Amazon's electronic service did not strictly comply with the alternative method of verification, it was a "harmless error." 37 C.F.R. § 201.18(h); see EMI Entm't World, Inc. v. Karen Records, Inc., 603 F. Supp. 2d 759, 763 (S.D.N.Y. 2009) (explaining that the NOI requirements in 37 C.F.R. § 201.18 "do not need to be followed with Prussian rigidity").

Finally, plaintiffs allege that Amazon does not have compulsory licenses to the four The American Dollar songs entitled "Call," "Transcendence," "Starscapes," and "Lights Dim," nor to the four "alt mixes" of those songs entitled "Call (Alt Mix)," "Transcendence (Alt Mix)," "Starscapes (Alt Mix)," and "Lights Dim (Alt Mix)." Plaintiffs claim that the "alt mixes" constitute separate musical works from the corresponding original songs. According to plaintiffs, Amazon never served an NOI for the original, non-alt mix songs, and even though it served an NOI for the alt mix songs, these songs are not susceptible to a compulsory license because they were created for "special projects" and were never released to the public. See 17 U.S.C. § 115(a)(1) (A compulsory license applies to musical works only "[w]hen phonorecords of a nondramatic musical work have been distributed to the public . . . . "). Plaintiffs claim that both the non-alt mix songs and the alt mix songs were streamed on Amazon's services.

Amazon agrees that it does not have a compulsory license to the alt mix songs, assuming

that they embody separate musical works from the original, non-alt mix versions.  It claims, however, that it does have a compulsory license to the original non-alt mix songs, and that those were the only versions streamed on Amazon's services.  Amazon admits that the relevant NOI erroneously included the parenthetical "(Alt Mix)" next to each song title, but claims that no reasonable person could believe Amazon was seeking a compulsory license to the alt mix songs because those songs were never released to the public.  Additionally, Amazon argues that although the NOI erroneously included "(Alt Mix)" next to each song title, it correctly identified the name of the album on which the non-alt mix songs appear.  Plaintiffs fail to respond to this argument.

I agree with Amazon that the NOI conferred on it a compulsory license to the original, non-alt mix versions of "Call," "Transcendence," "Starscapes," and "Lights Dim."  No reasonable factfinder could find that plaintiffs actually believed Amazon was seeking a compulsory license to songs that had never been released to the public.  Indeed, plaintiffs fail to allege how Amazon could have even acquired the non-public alt mix songs.  They also have not demonstrated that the alt mix songs are separate musical works from the non-alt mix songs.  Plaintiffs, as the authors and copyright owners, could have easily produced the alt mix songs, but they chose not to do so.  Therefore, the erroneous inclusion of the parenthetical "(Alt Mix)" was a "harmless error[] . . . that do[es] not materially affect the adequacy of the information" on the NOI and does not render it invalid.  37 C.F.R. § 201.18(g).

### III. **"Ambient" Songs**

Finally, plaintiffs allege that Amazon impermissibly altered the ten Yesh NOIs after they were served to include additional The American Dollar songs, which are known as "ambient" songs.  Each ambient song corresponds to a "non-ambient" song from The American Dollar and contains the same title as that song, with the added designation of "(Ambient)."  For example,

one of The American Dollar non-ambient songs is entitled "Circuits," and the corresponding ambient song is entitled "Circuits (Ambient)." Plaintiffs allege that although the ambient songs "share some elements" with the corresponding non-ambient songs, the ambient songs are "completely different" and comprise separate copyrightable musical works. Plaintiffs describe the non-ambient songs as falling within the category of "post-rock" and consisting of "mainly drums, guitar, and instrumentals." In contrast, they describe the ambient songs as within the "ambient genre" and containing "little to no guitars and drums," but including "various effects . . . [that] create a whole new feel to the recording."

Plaintiffs argue that because the ambient songs embody completely original musical works, Amazon was required to serve separate NOIs and obtain separate compulsory licenses from the licenses to the non-ambient songs. Alternatively, plaintiffs claim that, even if the Court finds that the ambient songs embody the same musical works as the corresponding non-ambient songs, Amazon was still required to serve a separate NOI for each new "release." Plaintiffs fail to explain what they mean by "release," but in this context I assume that they mean a sound recording of the musical work.

Amazon admits that it did not serve separate NOIs for the ambient songs. It argues that even though they constitute different sound recordings, the ambient songs embody the same musical work as the non-ambient songs, and neither the Copyright Act, nor the applicable regulations, require that an entity serve additional NOIs for new sound recordings of the same musical work. It argues that a separate NOI was not necessary because the monthly statements of account that it sent to plaintiffs, which broke down the number of plays of plaintiffs' songs per sound recording for the relevant period, put plaintiffs on notice that Amazon was paying royalties for the streaming of both sound recordings, and that it had grouped the ambient songs

together with their corresponding non-ambient songs.  For example, the statements of account listed the number of plays of the song "Circuits" separately from the number of plays for the song "Circuits (Ambient)."

There are thus two issues in dispute in regard to plaintiffs' ambient songs:  (1) Do the ambient songs embody different musical works than the non-ambient songs; and (2) assuming that Amazon is correct, and the ambient songs embody the same musical work as the non-ambient songs, was Amazon required to send separate NOIs for each sound recording of a musical work for which it had already obtained a compulsory license.  The first is a factual issue, while the second is a legal issue.

As to the first issue, Amazon argues that the ambient songs embody the same musical works as the non-ambient songs because they simply "strip[] out the guitar, drums, and other instrumental parts" from the musical composition underlying the non-ambient songs, and the mere removal of musical material – rather than the addition of substantial new musical material – is legally insufficient to create a separate copyrightable musical work.  Amazon relies on the following evidence to support that the ambient songs simply remove musical material from the non-ambient songs: (1) the report of Judith Finell, a musicologist who analyzed five representative ambient tracks in comparison to their corresponding non-ambient tracks, in which Finell opines that the only difference between the two is that the "'Ambient' recordings lack some of the instrumental parts and sound effects that appear in the corresponding 'non-Ambient' recordings;" (2) ASCAP, plaintiffs' licensing agent to collect royalties from public performance licenses, records on its online database that indicate that plaintiffs have identified the ambient songs as "alternative titles" for the non-ambient songs; and (3) The American Dollar's statement in a 2011 interview, in response to a question about the concept behind their ambient songs, that

they "were planning to strip out the guitar, drums and some other things" to create "alternative versions." Amazon, which has submitted a CD containing ten songs by The American Dollar (five ambient songs and their five corresponding non-ambient songs), also argues that any person who simply listens to the songs will hear that the ambient songs use the same notes and are the same songs as the corresponding non-ambient songs.

To rebut the Finnell report, plaintiffs submit the affidavit of Cupolo, one of the members of The American Dollar, in which Cupolo explains the process used to create the ambient songs. Cupolo avers that to make the ambient songs, he employed the use of "plugins," which are "software tools that can be used to modify the sound." According to Cupolo, the plugins "change the fundamental character of each song" and "refocus[] the listener on more ambient melodies and elements by strategically removing elements." Although Cupolo admits that the ambient songs "share some elements" with their corresponding non-ambient songs, Cupolo claims that to create the ambient songs, the band changes "part locations and construction" and even adds "new melodies." Cupolo also avers that while certain musical elements were removed from the non-ambient songs, other musical components and techniques were added. For example, to create the ambient version of the song "Signaling Through The Flames," Cupolo states that the "real bass" and the "drum part[s]" were removed, but a "synth bass" and "extra reverb" were added to create a new sound which sets the "lead melody."

Plaintiffs also argue that Amazon has taken the ASCAP records and The American Dollar's statements in the 2011 interview out of context. As to the ASCAP records, plaintiffs, relying on the Cupolo affidavit, assert that they only identified the ambient songs as alternative titles to ensure that they receive all royalties owed to them and that no songs are overlooked. But, plaintiffs claim, they never told ASCAP that the ambient songs and the corresponding non-

ambient songs "are the same." As to The American Dollar's statements in the 2011 interview, plaintiffs point out that the band merely stated that it was "*planning* to strip out certain musical components" (emphasis added), but it did not comment on what was ultimately done to create the ambient songs. Plaintiffs state that they did not explain the complete process in the interview because they did not want to confuse people without a musical background or discuss their trade secrets.

For the ambient songs to be considered separately copyrightable musical works as derivative works of the non-ambient songs, the ambient songs must be sufficiently "original." To be considered original, the ambient songs must contain "some substantial variation, not merely a trivial variation" from the non-ambient songs. L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486, 491 (2d Cir. 1976). The Second Circuit has characterized this test of originality as "modest, minimal," and having "a low threshold." Durham Indust., Inc. v. Tomy Corp., 630 F.2d 905, 910 (2d Cir. 1980). Applying the originality test to a musical work, the musical work will not be considered original if it is "merely a stylized version of the original song where a major artist . . . take[s] liberties with the lyrics or the tempo, [and] the listener hear[s] basically the original tune." Woods v. Bourne Co., 60 F.3d 978, 991 (2d Cir. 1995) (internal quotation marks and citation omitted). The derivative musical work must add "something of substance" to make "the piece to some extent a new work with the old song embedded in it but from which the new has developed." Id. However, when it comes to musical works, the originality test "requires only independent effort, not novelty," because "in the field of popular songs, many, if not most, compositions bear some similarity to prior songs." Nimmer on Copyright § 2.05 [B].

Applying this standard of originality here, the issue of whether the ambient songs embody different musical works from the non-ambient songs cannot be resolved on this motion

for summary judgment.  Often, factual issues can be resolved as a matter of law if a court concludes that a reasonable factfinder could only resolve the issue one way.  This is not one of those issues.

After listening to the sample songs Amazon provided, I cannot hold, as Amazon suggests, that no reasonable factfinder could find that the ambient songs are different musical works from the non-ambient songs.  Although there are clearly similarities between the ambient songs and the corresponding non-ambient songs, the degree of variation between the songs, and the possible varying interpretations of the significance of those variations, is a disputed factual issue.  Indeed, Amazon argues that the ambient songs cannot be considered original musical works because they do not add anything to original musical work, but, in his affidavit, Cupolo avers that some ambient songs were created by "adding new melodies" and using new techniques to replace the musical components that were removed from the non-ambient songs.  Plaintiffs have thus provided sufficient evidence to create a genuine factual dispute as to whether the ambient songs are "substantial variations" from the corresponding non-ambient songs.

The second issue is whether Amazon was required to serve separate NOIs for new sound recordings.  If Amazon ultimately prevails and the ambient songs are found to be the same musical works as the non-ambient songs, Amazon was not required to send separate NOIs for the ambient songs.

Plaintiffs rely solely on the holding in TeeVee Toons, Inc., v. DM Records, Inc., No. 05 Civ. 5602, 2007 WL 2851218, at *9-10 (S.D.N.Y. Sept. 27, 2007), to support their argument that Amazon was required to serve separate NOIs for new sound recordings of their musical works.  But that case in inapposite.  In TeeVee Toons, the defendant served an NOI notifying the plaintiff that it was going to use the plaintiff's songs on a specific album that the defendant was

releasing. The court held that the defendant was required to serve a separate NOI to use the same songs on subsequent albums that the defendant released because the NOI specifically stated that the plaintiff's songs were only to be used in connection with the one album. Id. In reaching this holding, the court relied on 37 C.F.R. § 201.18(d)(1)(v)(G), which requires the NOI to identify the "catalog number and label name or names to be used on the phonorecords" that the entity seeking a compulsory license expects to make. TeeVee Toons stands for the proposition that a separate NOI must be served to use the musical work in additional ways not identified on the original NOI, but it has no bearing on whether an entity that already has a compulsory license to a musical work needs to send a separate NOI when the copyright owner releases a new sound recording of that musical work.

Amazon stresses in its memoranda in support of its motion for summary judgment that the text of 37 C.F.R. § 201.18(d)(1)(v), which prescribes information that must be included in an NOI, makes clear that separate NOIs do not need to be sent for new sound recordings because it states that this information must be provided "[f]or each nondramatic musical work, " not each sound recording embodying the musical work. I agree with Amazon. Because the copyright in the sound recording is completely separate from the copyright in the musical work, it would make little sense to require an entity to serve a new NOI for each sound recording, when the entity is already required to obtain a consensual license to use that specific sound recording.

In fact, this exact issue was posed in a comment submitted to the Copyright Office in response to a Notice of Proposed Rulemaking it published in 2001, and addressed by the Copyright Office in a Notice of Final Rulemaking it published in 2004. See 69 Fed. Reg. 34,578. The comment suggested that the Copyright Office promulgate "a minimal set of regulations for the common situation in which online entities will be distributing digital

phonorecord deliveries of sound recordings already covered by a mechanical license."  In
response, the Copyright Office asked for additional comments on "whether a single NOI covers
all configuration formations or whether additional [NOIs] need to be filed each time the licensee
expects to use the musical work in a format not previously identified."  Id. at 34,579.  The Harry
Fox Agency, Inc. ("HFA"), a company that licenses artists' copyrights, submitted a comment
expressing that a regulation that would permit a single NOI to cover format configurations
beyond those identified on the NOI, "would disrupt longstanding industry practice and conflict
directly with established jurisprudence."  Id.

      The Copyright Office explicitly rejected HFA's argument and stated that its comment
"misses the mark."  The Copyright Office explained that only a single NOI must be served,
because the regulations do "not include any provision that would require a licensee to submit a
further formal [NOI] to the copyright owner of actual use beyond the initial [NOI] that listed
format configurations the licensee was using at the time or expected to use in the future."  Id. at
345,81.  It further explained that separate NOIs do not need to be served because the regulations
require the licensee to provide "accounting information . . . for each phonorecord actually made"
so that copyright owners are put on notice of "actual use."  Id; see 37 C.F.R
§§ 201.19(e)(3)(ii)(D), (f)(4)(i).

      This is exactly what Amazon did here.  Although it did not send separate NOIs for the
ambient songs, the statements of account that it sent to plaintiffs, specifically listing the number
of plays for the ambient songs, put plaintiffs on notice that Amazon was using those songs.
Although the view of the Copyright Office is not binding on this Court, for the reasons set forth
above, I find it persuasive.  Therefore, if plaintiffs' ambient songs are found to be the same
musical works as the non-ambient songs, Amazon was not required to serve additional NOIs and

its use of the ambient songs was covered by its compulsory license.

## CONCLUSION

Defendant's motion for summary judgment is granted except as to the issue of whether

the NOIs cover the ambient songs.  That is an issue to be decided at trial.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
     April 8, 2017